NOTICE

Decision filed 11/27/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220531-U

NO. 5-22-0531

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 12-CF-255 |
| | ) | |
| JARROD W. RUDDER, | ) | Honorable |
| | ) | Michael A. Fiello, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and McHaney concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The trial court's denial of the defendant's postconviction petition at the third stage of the postconviction proceedings is affirmed where the defendant failed to demonstrate prejudice when his trial counsel failed to include certain expert testimony.

¶ 2  The defendant, Jarrod W. Rudder, appeals from the third stage dismissal of his postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)).  He argues that the trial court erred in dismissing his petition following an evidentiary hearing where his trial counsel was ineffective for failing to present expert testimony that would have contradicted the State's evidence and would have supported his otherwise uncorroborated defense that he lacked the mental state required for first degree murder.  For the reasons that follow, we affirm.

1

¶ 3                          I. BACKGROUND

¶ 4     On April 23, 2012, the State charged the defendant with first degree murder for the death of M.P., a two-year-old child. The charges alleged that, on April 20, 2012, the defendant swung M.P. by the arm into a lamp and wall, causing M.P. to hit his head and die as a result of brain injuries. The defendant lived with M.P.'s mother, Amanda Howell, and her two children and was at home with M.P. when the incident occurred. Howell was at work at the time.

¶ 5                    A. Pretrial Appointment of Medical Expert

¶ 6     On October 31, 2013, prior to trial, the defendant filed a motion for appointment of Dr. Michael Weinraub as a medical expert to review the medical records in the case, consult with defense counsel, and testify at trial. On November 1, 2013, the trial court granted the defendant's motion for appointment of Dr. Weinraub.

¶ 7     On June 4, 2014, Dr. Weinraub prepared an interim report in which he indicated that M.P. was physically and emotionally abused before he was left in the defendant's care on April 20. Specifically, Dr. Weinraub noted that there was autopsy evidence showing older intracranial hemorrhaging. Dr. Weinraub also noted that M.P. was chronically malnourished, anemic, and vitamin D deficient. Dr. Weinraub determined that M.P.'s cause of death was malignant edema of his left cerebral hemisphere. However, the malignant edema was not proof that an excessive forceful impact had been applied to M.P.'s head immediately before his collapse. Rather, there had been a prior impact, and the malignant edema occurred as a result of a second head impact of a lesser force than the prior head impact. Dr. Weinraub indicated that the malnourishment and vitamin D deficiency allowed for a bone fragility disorder that could have caused lateral rib fractures following chest compressions for resuscitation.

¶ 8     Dr. Weinraub indicated that, in the case of a toddler with malignant edema, a lucid interval of hours to weeks would follow the initial head impact and then an additional and less forceful second impact would cause the fatality.  He noted that the triggering of the malignant edema by the final impact could have been accidental or abusive, but the intention to commit harm could not be determined by the degree of brain swelling.  He also noted that M.P. accidentally fell in the bathtub striking his head that night and was unconscious from this second impact, which resulted in the malignant cerebral edema; and the autopsy findings showed no skull fracture that would have indicated a forceful fatal blow.  Thus, Dr. Weinraub concluded that M.P. had a malignant cerebral edema that caused brain herniation without any evidence of a forceful fatal final blow.  He also concluded that M.P. sustained one or more head traumas before being left alone in the defendant's care on April 20, and these prior traumas resulted in a lucid interval that ended when he fell in the bathtub and collapsed that night.  Dr. Weinraub concluded that these prior traumas acted as a trigger for malignant edema and resulted in a minor head trauma on April 20 having a fatal outcome.  Despite Dr. Weinraub's appointment as a medical expert in this case, and his findings in his interim report, the defendant's attorney did not call him to testify at trial.

¶ 9                                    B. Trial

¶ 10    At the June 2015 jury trial, the following testimony was presented.  Clayton McDonnough testified that he was employed as a police officer for the Village of Elkville on the night in question.  He was dispatched to the defendant's residence after being notified that a child was unconscious; he identified the child as M.P.  He arrived on the scene at 11:58 p.m.  Upon observing M.P., McDonnough noticed that M.P. was unresponsive; he was exhibiting early stages of posturing in his arms, which meant that his wrists were turning toward his body and was an indication of a brain injury; he was having difficulty breathing; his right pupil was pinpoint and very sluggish

3

while his left eye was completely dilated; he had blood inside his mouth; and his jaw was tightly clenched. McDonnough also observed some bruising around M.P.'s mouth and to the left side of his stomach and old lacerations around his mouth and nose. Based on his prior employment as a paramedic, he knew that M.P. was in desperate need of medical attention.

¶ 11    The defendant told McDonnough that he was cooking in the kitchen when he heard a scream and a loud thud from the bathroom; M.P. was in the bathtub. The defendant discovered M.P. vomiting while lying partly out of the bathtub. In response, the defendant carried M.P. to the living room and put him on the couch. Because M.P. was turning blue and coughing, the defendant believed that M.P. was having an asthma attack. The defendant then placed M.P. on the floor, administered his inhaler, and performed chest compressions. M.P. became more alert, so the defendant put him back on the couch and went back to the kitchen. At around 10 p.m., M.P. stated that he was tired, and the defendant placed him on the floor over the air conditioning vent. The defendant continued to check on M.P., and, at one point, he had a lot of trouble getting M.P. to wake up. McDonnough was told that M.P. had tripped over a toy car at some point before this incident and had bitten his tongue earlier that day.

¶ 12    Howell, M.P.'s mother and the defendant's girlfriend at the time of the incident, testified that she was at work when she received a text message from the defendant about M.P.; she received the message at 10:59 p.m. In the message, the defendant told her to come home because M.P. was having an asthma attack and could not breathe. When she called the defendant, he said that M.P. was having an asthma attack but also said that M.P. had fallen out of the bathtub and hit his head. The defendant also said that, after M.P. had fallen out of the bathtub, he was running around but then he was unconscious and would not wake up. She noted that the defendant kept changing the story. The defendant never mentioned that he had to perform chest compressions on M.P. She

4

was not able to get home until around midnight. When she arrived home, she observed that M.P. was unconscious on the floor, his pupils were huge, and his breathing was faint. She tried to wake him up, but he was not responding. She and the defendant both called 9-1-1.

¶ 13 Before Howell left for work, M.P. was running around the house and playing; she did not notice anything unusual about him. She stated that, a few days prior to the incident, M.P. had fallen down a hill while riding on his toy tractor, and the tractor had rolled over on top of him. He had some bruising, a large abrasion on his shoulder, and a scratch on his nose from that incident. She also noted that there was an incident where she heard a loud thump from his bedroom and discovered that he had fallen off his bed and was lying with his head under the bed; this incident resulted in a scratch down his back. After these incidents, M.P. had no trouble walking or talking and did not seem to be in any lasting pain. She denied pushing M.P. backwards so hard that he hit his head against the living room wall and put a hole in that wall.

¶ 14 Brook Cross testified that she and Howell had been coworkers and friends, and she was frequently at Howell's house, including the day of the incident. While there, she observed and interacted with M.P. She noted that he was walking, talking, and was active. She did not notice anything wrong with him except he had rug burn on his shoulder. He did not complain about his shoulder or seem to be favoring one side. She also noticed that M.P. had scratches on his nose.

¶ 15 Ronald Pulliam, M.P.'s paternal grandfather, testified that M.P. stayed the night at his house on April 19, the day before the incident. While there, M.P. did not complain about being in any pain, and Pulliam did not observe him exhibit any signs of pain. However, he acknowledged that M.P. was feeling sick on April 20, but he did not believe that M.P. needed medical attention.

¶ 16 Marlene Harper testified that she was in a relationship with Pulliam, and they lived together. M.P. stayed overnight at their house on April 19. During the stay, she noted that he

5

walked normally, he talked with everyone, he did not seem to be in any pain, and he never told her that he was in pain. He had scratches on his nose but no bruising on his body.

¶ 17    Patricia Patrick, Howell's mother, testified that she was a registered nurse. She was at Howell's home for 5 to 10 minutes on April 20. While there, M.P. was crying because he was not feeling well. He had a headache and felt warm, so they gave him children's Tylenol. However, she did not notice anything about him that was alarming; she explained that he just looked like he did not feel well. He was standing on his own, walking normally, and talking to her. Prior to April 20, she saw M.P. often and noted that he seemed like his normal two-year-old self. She also saw him after the incident with the toy tractor and noted that he was perfectly fine.

¶ 18    Chris Liggett, a detective with the Jackson County Sheriff's Office, testified that he interviewed the defendant at the house on the night in question; he arrived at 12:30 or 1 a.m. During the interview, the defendant indicated that, a few days prior to this incident, M.P. had fallen while trying to jump from bed to bed in his bedroom and hit the side of his head. After that incident, the defendant noticed that M.P. had some difficulty eating and had headaches. The defendant explained that M.P. liked chicken nuggets, and if he was given any other food, he would make himself throw up; the defendant believed that M.P. was doing this to get Howell's attention.

¶ 19    As for the night in question, the defendant indicated that M.P. tripped over a toy car and bit his tongue, which started bleeding. The defendant then took M.P. to the bathroom to give him a bath. While M.P. was in the bathtub, the defendant went to the kitchen to cook dinner. He was in the kitchen when he heard a loud thud and a scream from the bathroom. When he went into the bathroom, he discovered M.P. "half in and half out" of the bathtub with his head down outside the bathtub; he also noted that M.P. had thrown up and was wheezing. Liggett did not see any vomit on the bathroom floor. The defendant then cleaned M.P. up and took him to the living room.

6

Because M.P. defecated while being carried to the living room, the defendant cleaned him up again. The defendant then sat M.P. on the couch and went back to cooking dinner, but he checked on M.P. approximately every 15 minutes. He eventually noticed that M.P. was wheezing and was not alert, so he did a sternum rub on M.P. M.P. responded to the sternum rub and told the defendant that he was tired. The defendant then placed M.P. on the floor over the air conditioning vent. M.P. was asthmatic and could not breathe, so the defendant pushed on his chest and administered his inhaler while he was lying on the floor. At this point, he texted Howell; it was approximately 10 p.m.

¶ 20   Jennifer Lindsey testified that she was a crime scene investigator for the Jackson County Sheriff's Office at the time of the incident. While in the house, she noticed some damage to the living room wall. That section of the wall was later removed and was collected as evidence.

¶ 21   Matthew Whalen, a paramedic for the Jackson County Ambulance Service, testified that, when he arrived at the house, M.P.'s breathing was irregular and very shallow, and M.P. was unresponsive. Whalen also noted that one of M.P.'s pupils was dilated while the other was constricted, and his hands had started posturing, which were both indications that he suffered a traumatic brain injury. He also examined M.P.'s body and noticed that M.P. had multiple bruises in different stages of healing. M.P. was unable to be intubated because his jaw was very tightly clenched, which was another sign of a traumatic brain injury.

¶ 22   Dr. Osama Aaflaq, an emergency doctor at Carbondale Memorial Hospital, testified that when M.P. was brought to the emergency room, he was unresponsive, and his breathing was unsteady. Dr. Aaflaq also noted that one of his pupils was dilated and fixed and the other was pinpoint and fixed, which was a sign of an intracranial bleed that led to a brain herniation. Dr.

7

Aaflaq indicated that this usually led to death if not addressed immediately. M.P. was subsequently airlifted to Children's Hospital in St. Louis for neurosurgical care by a pediatric neurosurgeon.

¶ 23    Dr. Jamie Kondis, a child abuse pediatrician, testified that she was an attending physician at the St. Louis Children's Hospital and was part of a team called the Child Protection Program, which investigated injuries to children to determine whether the injuries were related to inflicted trauma. M.P. was admitted to St. Louis Children's Hospital at 2:16 a.m. on April 21 as a Level 1 patient; Level 1 was the most critical. M.P. had bruises covering his entire body, including his abdomen, chest, and ears, and he had very critical head injuries. Dr. Kondis explained that soft areas, such as the buttocks, abdomen, or cheeks, were harder to bruise and required the application of more force. Dr. Kondis further explained that it was concerning to see bruising on the abdomen because, usually where the force was enough to bruise the abdomen, it was also enough force to damage the organs underneath. She noted that it was also really hard to bruise the ears because the area was made of cartilage. M.P. had bruising on his hip and flank area, which was concerning because of its close proximity to the kidneys and abdominal organs, and, as a protected location, it was an unusual location for an injury.

¶ 24    Dr. Kondis testified that M.P.'s CT scan indicated that he had a subdural hemorrhage and significant swelling of the brain that led to brain herniation. Dr. Kondis noted that M.P.'s prognosis was very grim. A neurosurgeon performed a craniotomy in an attempt to alleviate the pressure on M.P.'s brain, but his condition worsened, and some of his brain tissue began dying. M.P. eventually succumbed to his injuries. A chest X-ray and abdominal CT scan showed that M.P. had lateral rib fractures that were recent. There was also a lot of fluid around M.P.'s organs, which indicated that there were injuries to the organs.

8

¶ 25    Although Dr. Kondis was told that it was initially reported that M.P. was injured by falling out of the bathtub, she did not believe that this was true, noting that a fall in the bathtub would not cause the level of injuries that M.P. sustained.  She also noted that these injuries would not have occurred from a ground-level fall.  She indicated that the symptoms of M.P.'s injuries would be immediate; she noted that the individual might not lose consciousness immediately but would be lethargic, would not be eating or drinking normally, and would not be walking around normally. Dr. Kondis noted that it would be immediately apparent to those around that something very severe had happened.  The rib fractures would be painful and would make breathing and movement difficult.

¶ 26    Dr. Kondis opined that the tractor incident, falling off a bed or the side of a crib, or falling out of a bathtub would not have caused these injuries.  Dr. Kondis noted that it would take a significant amount of force to cause M.P.'s injuries; she noted that she had seen children who had been in horrible car accidents or had fallen from the roof of their porch that did not have as significant injuries as M.P.  Dr. Kondis confirmed that the amount of force necessary to cause the type of injuries that M.P. suffered could be from taking him and swinging him around by his arm into a wall.  Dr. Kondis noted she would not expect to see rib fractures from properly or improperly administered cardiopulmonary resuscitation (CPR) in children under five because their ribs were mostly cartilage.  She also noted that lateral rib fractures were caused by some sort of direct trauma, such as being hit with an object or being thrown against the side of an object, not typically from administering CPR.  M.P. falling from the bathtub would not create enough force to cause his rib fractures.

¶ 27    Dr. Kondis noted that M.P.'s autopsy report indicated the presence of very severe retinal hemorrhages and retinal schesis, which would not have been caused by severe coughing, an asthma

9

attack, a short fall, or vomiting. Dr. Kondis explained that the retinal hemorrhages in the pattern that M.P. had were not typical, except for with very severe head trauma (for instance, if the head was run over by a car and completely crushed, or there was some very severe trauma such as being thrown into a wall and breaking the wall). Dr. Kondis opined that M.P.'s injuries were abusive injuries and were inflicted trauma.

¶ 28    Dr. Kondis acknowledged that the brain swelling was a secondary injury to whatever injury caused the veins to rupture around M.P.'s brain and bleed but noted that the swelling could happen pretty quickly. She noted that the autopsy report indicated that M.P. had a significant amount of diffuse axonal injury that was caused by something more than a fall to the floor. Dr. Kondis acknowledged that the term a "significant amount of force" was relative but that it would be enough force that someone observing it would have recognized the injury as severe. She noted that an individual would know that the force being applied was too much force.

¶ 29    Dr. Jane Turner, an assistant medical examiner for the city of St. Louis, testified that she performed M.P.'s autopsy. During the examination, she noted that M.P. had bruising on his left upper chest, which was not a typical injury for a toddler; and an abrasion and bruising on his left jaw, which indicated that his face was grabbed. M.P. also had a large area of recent bruising around his left hip or flank area. Dr. Turner explained that it was uncommon to see a bruise on the soft portion of the abdominal surface and opined that it was caused by a blunt force injury by something that had a fairly broad surface. M.P. had another bruise lower on his pelvic area and one on his left ear, which were not typical locations for injury. He also had bruising on his left elbow, left leg, and left forearm; he had abrasions on his forehead; he had a contusion near his right eye; and he had an abrasion or scratch near the bridge of his nose.

10

¶ 30    M.P. also had multiple recent rib fractures on both the left and right sides of the ribs; he had four rib fractures on his left side and four or five on the right side. Dr. Turner opined that M.P.'s rib fractures were not caused by CPR, even if improperly administered. She explained that it was unlikely that performing CPR would cause fractures on a child's ribs because the ribs were more elastic and not as brittle as adult ribs, and rib fractures caused by CPR would typically occur in the anterior (front) ribs rather than the lateral (side). She noted that the typical cause of lateral rib fractures in a child was squeezing of the chest cavity; she noted that lateral rib fractures could also be caused by a strike to that side or a strike into a table, but it would have to be significant force to cause eight rib fractures. She noted that a person suffering with multiple lateral rib fractures would have restricted breathing because of the pain and would experience pain with movement and pain to the touch.

¶ 31    M.P. had hemorrhaging or bruising to the left and right sides of his diaphragm muscle, which were separate injuries and would typically be caused by blunt trauma of a significant force. He also had hemorrhaging in the mesentery, which was tissue located deep within the body behind the large intestines. Dr. Turner noted that this injury was concerning because it would take a significant, forceful blow to cause it; she believed that a blunt instrument made some sort of forceful impact to the body. She noted that pushing an individual into a hard object could have caused this injury. Based on the abdominal injuries, she opined that M.P. suffered multiple forceful blows to his abdomen. To inflict these injuries, a reasonable person would realize that they were using force and would realize that they were inflicting harm on M.P.

¶ 32    M.P. also had an injury to his upper inner lip, but there was no indication that he had bitten his tongue. M.P. had multiple bruises or contusions on the under surface of his scalp, and each contusion represented a separate impact. He had different hemorrhages on the surface of his brain;

11

he had subdural and subarachnoid hemorrhages, which were indicative of injury when there had been "rotational forces applied with acceleration, declaration," such as forceful shaking or a forceful blow to the head. M.P. also had swelling of the entire brain, but there was more distortion on the left side due to the swelling. There was evidence of cerebral infarction in the brain, which meant that the tissue was deprived of blood and died, and the swelling caused herniation of the brain. Based on these injuries, Dr. Turner opined that there was significant force to the area. Dr. Turner noted that M.P. would have experienced immediate symptoms, including loss of consciousness, seizure activity, vomiting, and inability to feed. She noted that the swelling was a secondary reaction to an injury; the brain reacted to injury by swelling. She also noted that usually the brain reacted very quickly to injury and would start swelling immediately. However, the extent of the swelling in M.P.'s brain occurred over time.

¶ 33   M.P.'s brain also had diffuse axonal injuries, which were brain injuries from forces being "applied to the head, rotational forces, acceleration, deceleration injury causing relative rotation of the different structures in the brain." Dr. Turner noted that a simple fall to the ground would not typically cause these injuries, but they could have been caused by swinging a child around in such a way that he struck a hard object. The development of the symptoms of diffuse axonal injuries would be immediate and could include impaired consciousness, seizure activity that would include clenching of the jaw, and not being able to function normally. Dr. Turner opined that these injuries were not caused by a ground-level fall, running and tripping over a toy, or falling out of a bathtub.

¶ 34   An examination of M.P.'s eyes revealed that there was bleeding into the retinas of both eyes, which was often associated with an abusive head injury. Dr. Turner concluded that the cause of M.P.'s death was closed head injury, and the cause of his abdominal injuries was blunt force

trauma. She noted in her official report that she found two old lesions on M.P.'s brain. However, based on a review of the photographs, she believed that was an incorrect assessment. She noted that the brain was fixed in formalin, which caused the lesions to turn brown and gave the impression that they were old, but they were instead acute. She explained that she was able to review the photographs from the autopsy before the brain was placed in formalin and realized that the injuries were fresh.

¶ 35　Dr. Turner acknowledged that a lucid interval could be common with an injury to the dura of the brain, depending on the mechanism of the injury. However, a lucid interval was not possible with a diffuse axonal injury. She also acknowledged that, if the brain had been previously injured, it could be susceptible to future injury in that same area. She did not identify an area of M.P.'s brain that had an old injury that had been reinjured. She noted that a diffuse axonal injury could be anywhere from mild to severe, and depending on the severity, the individual could still be conscious and semi-alert. She did not believe that there was a significant period of time where M.P. was fine and then suddenly collapsed from his injuries.

¶ 36　Michael Ryan, a detective for the Jackson County Sheriff's Office, testified that he interviewed the defendant several times. These interviews were recorded, and the videos were played for the jury. In the first two interviews, the defendant essentially told Ryan what he had told the officers who arrived on the scene. He told them about an earlier incident where M.P. fell off his bed and landed with his head underneath his bed, and the incident where he had fallen off his toy tractor. He further told them that, two days after the incident with the toy tractor, M.P. had knocked his head into the kitchen countertop twice. He attributed many of M.P.'s bruises to these incidents. He believed that the bruises to M.P.'s stomach could have been from him and Howell pushing down on M.P.'s stomach before paramedics arrived. He assumed that the broken ribs

13

were from when he performed CPR on M.P. He explained that he did not call 9-1-1 earlier because he thought M.P. was having an asthma attack and was just tired.

¶ 37    In the fourth interview, the defendant indicated that Howell physically abused M.P. He described an incident on April 20 where Howell grabbed M.P. by the face and threw him against the wall, which made the dent in the hallway wall. Also, earlier that week, M.P. was crying, and when the defendant asked him what was wrong, he responded, "mommy mean," and pointed to his mouth. Howell had backhanded M.P. so hard that M.P.'s tooth went through his lip. Also, on the same night that M.P. fell off his bed, the defendant saw Howell smack M.P. in the face causing him to fall, and his rib cage bounced off a table. After hearing the defendant's allegations against Howell, the detectives brought Howell into the interview room, so she could also hear the allegations against her. According to Ryan, she seemed shocked and confused by the allegations.

¶ 38    In his subsequent interviews, the defendant acknowledged that the hole in the living room wall occurred while M.P. was in his care on April 20. The defendant explained that M.P. threw up a corndog, so he told M.P. to go to the bathroom and get ready to take a bath. The defendant went into the kitchen, but when he returned to the living room, M.P. had not moved, and this made him mad because M.P. just sat there and let the puke run down his shirt. The defendant then jerked M.P. up by his wrist, but when M.P. yelled, "ouuuu," he loosened his grip a little, which caused M.P. to be flung into the lamp and wall. Ryan indicated that he believed that M.P. hit some part of the wall stud when he was thrown into the wall. The defendant claimed that M.P. had vomit on his hands, which made his hand slip from the defendant's grip. The defendant believed that the hole in the wall was either caused by M.P.'s head or shoulder. The defendant then walked M.P. into the bathroom and left M.P. in the bathtub while he returned to the kitchen to finish cooking.

14

¶ 39    While in the kitchen, the defendant heard a thud from the bathroom, so he ran to the bathroom and discovered M.P. lying partly outside of the bathtub. The defendant then attempted to pick M.P. up, but the defendant accidentally dropped him because he was squirming. M.P. hit his head between the toilet and the vanity area. After the fall, M.P. could not walk straight, so the defendant grabbed him by the wrist and walked him down the hallway toward the living room. The defendant sat M.P. down in a chair and attempted to put his pants on him. However, M.P. started grabbing at the defendant's hair and "freaking out," so the defendant pushed him causing him to fall back and hit a table. M.P. could not stand by himself and was coughing so bad that he defecated on himself. The defendant then cleaned him up, put him on the living room couch, and returned to the kitchen.

¶ 40    When the defendant returned to the living room, he noticed that M.P.'s lips were blue. The defendant then put M.P. on the floor, administered his inhaler, and gave him chest compressions. After M.P. got some color back into his face and was not coughing as much, the defendant placed him on the air conditioner vent because M.P. was sweating. However, the defendant subsequently noticed that M.P. was unresponsive, and his pupils were dilated. He called 9-1-1 when Howell got home a few minutes later. He explained that he did not call 9-1-1 when M.P. hit the wall because he believed that M.P. just suffered a sprained wrist. He did not call later because he thought M.P. was having an asthma attack, and M.P. was responsive. He acknowledged that he lied about Howell knocking M.P. into the wall. However, the defendant maintained that she once threw a cell phone at M.P., kicked a toy tractor that hit him, hit M.P. in the mouth, and spanked him on his bare buttocks.

¶ 41    Morgan Wright, Howell's former coworker, testified that she was at Howell's house with Cross on the night of the incident. She explained that she was there because she was taking Howell

15

to work, and she wanted to spend time with the children. While there, she observed a bruise on M.P.'s face, two rug burns on his back, and a cut on his lip. M.P. was playing and running around the house that night. At one point, she observed him running through the kitchen, slipping on the floor, and falling into a cabinet; he hit his head on the cabinet. After the incident, he said that his head hurt but then went back to playing. She also observed him leaning out of a window, slipping, and falling back inside; he also hit his head in this incident. He cried for a few minutes but then became rambunctious again.

¶ 42   Wright also observed Howell picking M.P. up by his wrist and tossing him in his bedroom for a time-out. In response, M.P. started crying and complaining about his wrist hurting. However, Wright acknowledged that she did not see Howell tossing M.P. into the bedroom; she assumed that was what happened based on the loud noise that she heard. Wright explained that Howell had a "pretty wicked temper," but she had never seen the defendant lose his temper with M.P. M.P. also complained that his stomach hurt that night, but they did not think it was serious. Wright acknowledged that, after the incidents that she observed that night, M.P. was fine and continued playing and talking to her. He was not showing any signs of major injury.

¶ 43   After deliberations, the jury found the defendant guilty of first degree murder. On August 18, 2015, the defendant was sentenced to 80 years' imprisonment to be followed by 3 years of mandatory supervised release. Subsequently, on November 8, 2018, his conviction was affirmed on direct appeal. *People v. Rudder*, 2018 IL App (5th) 150413-U.

¶ 44                    C. Postconviction Proceedings

¶ 45   On June 3, 2019, the defendant filed a *pro se* petition for postconviction relief, contending, *inter alia*, that he was denied effective assistance of trial counsel because counsel failed to arrange for Dr. Weinraub to appear and testify on his behalf. In the petition, the defendant indicated that

16

Dr. Weinraub was supposed to complete a final report by March 12, 2015, and he was planning to testify at the trial. However, on April 14, 2015, the defendant's counsel informed him that Dr. Weinraub had never prepared the final report and decided not to testify. Attached to the petition was Dr. Weinraub's June 2014 interim report and his May 2019 affidavit. In the affidavit, Dr. Weinraub indicated that he had initially been approved for 20 hours of work on the case, but after completing his interim report, he had already used those 20 hours, so he requested approval for an additional 20 hours. He needed to consult with a neuroradiologist and a forensic pathologist; he explained that consultation with these other experts was crucial to the case due to the evidence of the older brain bleeds. He also wanted to review all of M.P.'s medical records before making a final report.

¶ 46    After requesting additional hours, Dr. Weinraub was approved for eight more hours in January 2015. These hours allowed him to reacquaint himself with the case and to confer with defense counsel, but it did not allow him to complete his research or to confer with the other experts. He was never granted any additional hours or funding. He also noted that defense counsel never contacted him again and never arranged for him to testify, although his opinions in his interim report contradicted the autopsy report findings.

¶ 47    On June 25, 2019, the trial court entered an order, advancing the defendant's *pro se* postconviction petition to the second stage of the postconviction proceedings, and appointing him counsel. Thereafter, the defendant's counsel filed an amended postconviction petition, which included the defendant's contention that his counsel was ineffective for failing to arrange for Dr. Weinraub to testify. The State then filed a motion to dismiss the amended postconviction petition, but, on July 17, 2020, the court denied the motion with regard to the defendant's argument about Dr. Weinraub's testimony and advanced that claim to a third-stage evidentiary hearing.

¶ 48    At the December 3, 2021, third-stage evidentiary hearing, the following testimony was presented. Kelley Zuber, the defendant's trial counsel, testified that the defendant's previous attorney was the one who had hired Dr. Weinraub. Zuber noted that Dr. Weinraub was difficult to contact; he explained that he had to leave a dozen messages before Dr. Weinraub finally returned his call. Zuber talked to Dr. Weinraub between 6 to 10 times during the case. During most of those conversations, all Dr. Weinraub talked about was money. Zuber explained that Dr. Weinraub indicated that he was not a neurologist, so he needed a forensic pathologist or forensic neuroradiologist to review the case, and he needed additional funds for those consultations. They did have more substantive conversations closer to trial.

¶ 49    Although Zuber talked to the judicial administrator about requesting additional funds, he never petitioned the trial court for those funds because he did not believe that Dr. Weinraub had much to offer from a strategic point of view. Zuber explained that Dr. Weinraub was not there, he was an after-the-fact witness and did not perform the medical examination, and he had only seen the coroner's report. He also explained that the theory was that Howell had caused some injury to M.P. before she went to work, and those injuries manifested later when the defendant was alone with M.P. He noted that he was familiar with this concept in general because he had dealt with similar cases, and he did not think the jury would "ever buy that theory." He did not think the jury would believe that someone else caused the injuries to M.P. or believe anything that the defendant claimed, and he did not have another witness corroborating that the injuries were caused by someone else. He discussed his concern with Dr. Weinraub on March 9, 2015, and March 10, 2015.

¶ 50    Although Dr. Weinraub initially indicated that his findings contradicted the State's forensic pathologist and pediatric specialist, Dr. Weinraub later indicated that he felt he could no longer

18

testify consistently with the findings in his interim report. Zuber learned in their March 9 and March 10 conversations that Dr. Weinraub did not know anything about the physical evidence, including the fact that the State had drywall from the defendant's residence with a hole the size of the child's head, and the defendant's interviews where he admitted to M.P. hitting his head when he swung him into the wall. Once Zuber told Dr. Weinraub about this additional evidence, Dr. Weinraub indicated that he could not say that the defendant's actions did not cause the injury to M.P. or that M.P. did not die exactly as the medical examiner said, he could not add anything to the case, and he refused to testify. Although Dr. Weinraub noted that M.P. could still have had lucid moments and not shown symptoms for a while, he did not believe that he had anything to offer. Thus, Zuber explained that he had two reasons for not arranging for Dr. Weinraub to testify: he thought it was a bad trial strategy, and Dr. Weinraub refused to testify.

¶ 51    Although Zuber never thought it was a good trial strategy and never made sense, he tried to keep an open mind when he took over the case. He explained that the theory that there was a previous injury that manifested later did not "hold water" for many reasons that he did not think he could explain to the jury, so he decided to focus on the defendant's intent instead. He believed that the death was the result of an accident. Zuber sought to prove that the defendant did not realize M.P. had slipped out of his hand, and, although he swung M.P. around, he had not purposefully thrown M.P. against the wall and did not realize that M.P. was going to hit the wall. Zuber explained that Dr. Weinraub's testimony would be about the possibility of the injuries being caused earlier, not that they were or when they occurred.

¶ 52    In preparation for cross-examining the medical witnesses, Zuber did a lot of self-study by looking at the reports and researching the medical terms, explaining that he was not a doctor, but he was smart enough to look up medical terms and familiar enough with physiology to figure it

out.  He noted that the medical experts were not present when the incident occurred, so they did not know the defendant's intent or whether the defendant caused the injuries.

¶ 53    Dr. Weinraub testified that he reviewed the autopsy reports, medical records, police investigation reports, and transcripts of the preliminary hearings before writing his interim report. He had requested M.P.'s outpatient pediatric medical records from before the incident, M.P.'s family medical history, any records from the Illinois Department of Children and Family Services, and any additional investigation reports, but he never received these records.  He denied talking with Zuber 6 to 10 times and noted that they only spoke 3 times.  He noted that their conversations were brief, and they only had very limited conversations about the substance of the case; there was never an in-depth discussion about the case.  He did not believe that an average attorney had sufficient expertise to cross-examine an expert witness about the injuries in this case without consulting another expert or professional.  Although he offered to assist Zuber in preparing for cross-examination of the State's expert witnesses, Zuber did not take him up on the offer.

¶ 54    Dr. Weinraub denied refusing to testify, but he acknowledged that he said he would not testify unless there was a court order guaranteeing that he would get paid.  He also denied changing his assessment of the case or saying that he could no longer testify as to the findings in his interim report.  He noted that there was no new information that would have caused him to change his assessment.  He explained that he never got the records that he had requested, and there was nothing that Zuber said in their March discussions that would have changed his findings as Zuber's statements were hearsay.  However, he acknowledged that his findings could have potentially been different if he had received all of the materials that he had requested.  He indicated that, had he received the court order guaranteeing payment, he would have been willing to testify even if he never received the requested materials.  However, he explained that his testimony would be based

20

on the records that he had obtained. He did not recall having a conversation with Zuber on March 10.

¶ 55    Dr. Weinraub indicated that the findings in his interim report were in direct contradiction with the findings of the State's expert witnesses and that he had found medical conditions that were not given due weight. He believed that those medical conditions would have affected how the injuries were analyzed or interpreted. His forensic investigation was never completed, but he believed that, if he had been able to complete the investigation, and his opinions had remained the same, his testimony would have been relevant in the defendant's trial. He explained that M.P. had underlying medical conditions that could have mimicked child abuse, such as malnourishment, low protein, low calcium, being anemic, and coagulation disorder. He noted that rib fractures would have occurred more frequently with these conditions, and a less severe incident could have caused severe bruising because of coagulation disorder. He also noted that the neuropath report indicated that M.P. had old injuries to the brain, and these old hemorrhages could have contributed to edema of the brain with a second, minor blow to the head. He explained that a simple fall out of a bathtub or bumping his head into a wall could have been exacerbated because of these old injuries.

¶ 56    Dr. Weinraub noted that, although he was waiting for Zuber's phone call about testifying for trial, he never received that call. He acknowledged that he did not take notes of his conversations with Zuber and that his testimony was based on memory, but he remembered that they never discussed certain things that were important in the case because he remembered being upset about it. He also acknowledged that he may have discussed the findings in his interim report with Zuber, but he noted that discussion was very limited and not as extensive as he was used to with other attorneys. He further acknowledged that he could not definitively say who killed M.P.,

someone intended to kill M.P., or exactly when the injuries occurred. He agreed that he had wanted to consult with a forensic pathologist and a neuroradiologist.

¶ 57    When questioned about what impact the defendant's admission to swinging M.P.'s head into the wall had on his interim report findings, Dr. Weinraub noted that he would look for signs of that impact, such as a skull fracture or hematoma in the area, and he noted that there were none of those signs. Thus, he concluded that there was no fatal blow to the head. He noted that the cause of death was brain swelling on the left side, and something had caused M.P.'s brain to swell, but he could not tell whether it was accidental or intentional. However, he noted that a minor trauma like falling in the bathtub or M.P.'s head being hit less severely on the wall could have caused it. He indicated that the defendant swinging M.P. into the wall could have been the cause of the swelling, but he noted that, since there was no skull fracture or subdural hematoma, the impact was not severe. However, he noted that it could have caused severe swelling because of a prior brain bleed. He believed that M.P. had preexisting conditions that made it more likely that a less severe blow to the head would have caused the swelling. He could not determine when the previous injuries occurred but noted that it was at least one month or longer.

¶ 58    On July 21, 2022, the trial court entered an order, denying the defendant's amended postconviction petition. In the order, the court noted that, in Dr. Weinraub's interim report, he made no reference to the defendant's admission about M.P. being flung into a lamp and a wall. The court also noted that Dr. Weinraub's affidavit indicated that consulting with a neuroradiologist and a forensic pathologist was crucial due to what may have been older bruising on M.P.'s body and older bleeding on his brain. The court further noted that Dr. Weinraub concluded that the possible prior head injuries could have caused a later minor blow to the head to have more severe consequences than it would have had without those prior injuries. Thus, the court found that, based

22

on the evidence, the most Dr. Weinraub could have said in his testimony was that there were possible preexisting head injuries that could have caused a later minor injury to be fatal.

¶ 59    However, the trial court indicated that the difficulty with that testimony was that the evidence at trial was not that M.P. received a minor head injury on April 20. Instead, the evidence demonstrated that he was flung with enough force into a wall to leave an indentation at the point of impact. The court noted that it was unknown how Dr. Weinraub would have responded to the inevitable cross-examination about the defendant's admission and whether the impact of M.P.'s head against a wall could have caused his death even without any previous head trauma. The court found that the defendant failed to show that Dr. Weinraub's testimony might have reasonably caused a different verdict. Although his testimony would have given the jury additional information not provided by the State's witnesses, there was no evidence that he could testify that the blow to the head did not cause the injuries that resulted in M.P.'s death. The court then concluded that, given the overwhelming evidence, including the defendant's own admissions, that the defendant caused M.P.'s death, the failure to call Dr. Weinraub as a witness did not undermine the court's confidence in the jury's verdict. Thus, the court found that the defendant failed to show sufficient prejudice to succeed on his claim. The defendant appeals.

¶ 60                                    II. ANALYSIS

¶ 61                              A. Postconviction Rules

¶ 62    The Act provides a three-stage procedure for a petitioner alleging substantial deprivations of his constitutional rights. *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). At the first stage, the trial court, without input from the State or further pleadings from defendant, determines if the petition is frivolous or patently without merit. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). If the petition is not dismissed at this stage, then it advances to the second stage where counsel may

23

be appointed to indigent defendants (725 ILCS 5/122-4 (West 2020)) and where the State is permitted to file a motion to dismiss or an answer to the petition (*id.* § 122-5). *Hodges*, 234 Ill. 2d at 10-11. At this stage, the court must determine whether the petition and any accompanying documents make a substantial showing of a constitutional violation. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). If petitioner satisfies his burden of making a substantial showing of a constitutional violation, then the petition advances to a third-stage evidentiary hearing. *Id.*

¶ 63    At the third-stage evidentiary hearing, the trial court "may receive proof by affidavits, depositions, oral testimony, or other evidence." 725 ILCS 5/122-6 (West 2020). An evidentiary hearing allows the parties to develop matters not contained in the trial court record. *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 30. A defendant has the burden of proving a substantial showing of a constitutional violation. *Id.* Where fact-finding and credibility determinations are involved, a reviewing court will not reverse a trial court's decision as to whether there has been a substantial showing of a constitutional violation unless that finding is manifestly erroneous. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Manifest error is error that is clearly evident, plain, and indisputable. *People v. Coleman*, 2013 IL 113307, ¶ 98. However, if there is no new evidence presented, and the issues are questions of law, we will apply a *de novo* standard of review. *Pendleton*, 223 Ill. 2d at 473.

¶ 64                    B. Ineffective Assistance of Counsel

¶ 65    A defendant's claim of ineffective assistance of counsel is analyzed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on an ineffective assistance of counsel claim, a defendant must show both that counsel's performance was deficient, and that the deficient performance prejudiced defendant. *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 10. The deficient-performance prong requires a defendant to show counsel's

24

performance fell below an objective standard of reasonableness. *People v. West*, 187 Ill. 2d 418, 432 (1999). To establish the second prong, a defendant must show that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *People v. Popoca*, 245 Ill. App. 3d 948, 955 (1993). When weighing the impact of counsel's errors, we consider the totality of the evidence before the fact finder. *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 33. A defendant must satisfy both prongs of the *Strickland* test, and a failure to satisfy either prong precludes a finding of ineffectiveness. *Thomas*, 2017 IL App (4th) 150815, ¶ 11.

¶ 66 Here, focusing on the prejudice prong, the trial court found that the defendant failed to show that Dr. Weinraub's testimony might have reasonably caused a different verdict. In making this decision, the court noted that the most Dr. Weinraub could have said was that there were possible preexisting head injuries that could have caused a later minor injury to be fatal. However, the evidence indicated that M.P. had not just received a minor head injury on April 20. Instead, the evidence demonstrated that M.P. was swung with enough force into a wall to leave an indentation at the point of impact. The court further noted that there was no evidence that Dr. Weinraub could testify that the impact with the wall did not cause the head injuries that resulted in M.P.'s death.

¶ 67 Assuming *arguendo* that trial counsel's performance was deficient, we agree with the trial court's conclusion that the defendant failed to prove that there was a reasonable probability that the result of the proceeding would have been different if Dr. Weinraub had testified. The evidence of the defendant's guilt at trial was overwhelming. The defendant was in charge of M.P. at the time that M.P. was injured and taken to the hospital. The defendant admitted picking M.P. up by

the wrist and flinging him into the lamp and the wall. The impact left a hole in the wall near the wall stud, and Ryan believed that M.P. hit some part of that wall stud. This encounter, followed by an approximately two-hour period of time with no medical intervention, ultimately led to M.P.'s death.

¶ 68    Dr. Turner testified that M.P.'s brain had diffuse axonal injuries, that a significant force was the cause of these injuries, that M.P. would have immediately experienced symptoms with these injuries, and that a lucid interval was not possible with diffuse axonal injuries. Dr. Turner noted that a simple fall to the ground or a fall out of a bathtub would not typically cause these injuries but that they could have been caused by swinging a child around in a way that he struck a hard object. She did not identify an area of the brain that had been previously injured, and she did not believe that there was a significant time that M.P. was fine and then collapsed from his injuries. She also noted that M.P. had eight recent rib fractures and that there would have to be significant force to cause eight rib fractures. She concluded that these rib fractures were unlikely to be caused by administering CPR, even if improperly administered. She also concluded that M.P.'s injuries demonstrated that he suffered from multiple forceful blows.

¶ 69    Dr. Kondis agreed that M.P. would have immediately exhibited symptoms of his brain injuries and that the diffuse axonal injuries were caused by a significant amount of force, such as by taking a child by the arm and swinging him into a wall. She noted that it would have been immediately apparent that something severe had happened to M.P. and that the individual would have known that the force being applied was too much force. She did not believe that any of the reported incidents before the defendant was left alone with M.P. on April 20 would have caused these injuries. She indicated that the rib fractures were caused by blunt trauma and that M.P.'s

26

injuries were abusive injuries and were inflicted by trauma. She also identified bruising in areas that were not the usual locations for injuries to children.

¶ 70 Also, Howell and the other witnesses who observed M.P. before that night indicated that, although he had suffered some accidental injuries prior to the incident, he always seemed fine afterwards and did not appear to exhibit any lasting injuries or pain. They further indicated that, before the incident on April 20, M.P. was acting normally; they noted that he was talking, playing, running, and interacting with them. The jury also heard evidence of the defendant's changing story as to what happened that night; he initially said that the injuries occurred when M.P. accidentally fell in the bathtub that night, but then he changed his story and blamed Howell for the injuries, claiming that she threw M.P. into the wall. He ultimately admitted that he was the one who swung M.P. into the wall.

¶ 71 Moreover, Dr. Weinraub's findings in his interim report were the product of an investigation that was incomplete, and he needed further information, which included consultations with a neuroradiologist and a forensic pathologist, to either bolster, amend, or change his findings. As noted by the trial court, his interim report made no mention of the defendant's admission that he swung M.P. into a wall with enough force to leave a hole in the wall. Also, Dr. Weinraub's findings in his interim report were based on old hemorrhages discovered in M.P.'s brain. However, Dr. Turner explained that her initial findings that there were old hemorrhages in M.P.'s brain were incorrect. She noted that those findings were based on a visual observation of the brain and were the result of M.P.'s brain being fixed in formalin after it was removed during the autopsy, which caused the lesions to turn brown and gave the impression they were old. However, she noted that they were actually acute. She realized her mistake when she reviewed

27

the photographs from the autopsy before the brain was placed in the formalin and noticed that the injuries were fresh.

¶ 72    At the third-stage evidentiary hearing, Dr. Weinraub indicated that any testimony that he would have provided at the defendant's trial would have been based on his understanding of the case at the time that he prepared the interim report.  As noted by the trial court, the most that he could say was that there were possible preexisting head injuries that could have caused a later minor head injury to be fatal.  Although Dr. Weinraub testified that he believed that the impact to the wall was not severe, the evidence demonstrated that it left an indentation in the wall at the point of impact.  In light of the strong evidence against the defendant, including his own admissions, the defendant cannot establish that there was a reasonable probability that the outcome of his trial would have been different, even if Dr. Weinraub had testified about his findings in his interim report.

¶ 73                                III. CONCLUSION

¶ 74    For the foregoing reasons, we affirm the trial court's dismissal of the defendant's postconviction petition.


¶ 75    Affirmed.